# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| REGIONAL MULTIPLE LISTING SERVICE OF MINNESOTA, INC., *doing business as NorthStarMLS*, | Civil No. 12-965 (JRT/FLN) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| AMERICAN HOME REALTY NETWORK, INC., | |
| Defendant. | |

Calvin L. Litsey, Jared B. Briant, and Richard A. Duncan, **FAEGRE BAKER DANIELS LLP**, 90 South 7th Street, Suite 2200, Minneapolis, MN 55402-3901, for plaintiff.

Chad A. Snyder and Adam P. F. Gislason, **SNYDER GISLASON FRASIER LLC**, 233 Park Ave South, Suite 205, Minneapolis, MN 55415, for defendant.

Plaintiff Regional Multiple Listing Service of Minnesota, Inc. ("RMLS") brought this action for copyright infringement against Defendant American Home Realty Network, Inc. ("AHRN"). RMLS now brings two motions before this Court. First, RMLS moves the Court for a finding of contempt against AHRN and AHRN's Chief Executive Officer Jonathan Cardella for violations of the Court's September 27, 2012, preliminary injunction order. The Court will grant this motion, in part, because AHRN has displayed material copyrighted by RMLS without authorization. Second, RMLS moves to dismiss AHRN's counterclaims, including its counterclaim under the Sherman

Act, 15 U.S.C. § 1.  The Court will deny this motion because AHRN has sufficiently

alleged counterclaims that survive a motion to dismiss.

## BACKGROUND

### I.    PARTIES

Much of the background for this action is outlined in the Court's previous

decision.  *See Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network,*

*Inc.*, Civil No. 12-965, 2012 WL 4470286 (D. Minn. Sept. 27, 2012).  The Court will

repeat only some of those facts here.

RMLS is a Minnesota corporation with its principal place of business in St. Paul,

Minnesota.  (Compl. ¶ 3, Apr. 18, 2012, Docket No. 1.)  RMLS is a multiple listing

service company that serves more than 13,000 real estate brokers and agents in

Minnesota and western Wisconsin.  (*Id.* ¶ 8.)  Like other multiple listing services

("MLSs") throughout the United States, RMLS is a local cooperative run by local

member-brokers, affiliated with the National Association of Realtors ("NAR"), who pool

and disseminate information on homes available for sale in their regions.  (First Am.

Countercl. ("Countercl.") ¶ 17, Dec. 21, 2012, Docket No. 73.)  RMLS acts on behalf of

its member-brokers within the relevant market and is governed by a Board of Governors

whose members are appointed by those member-brokers.  (*Id.* ¶ 15.)

RMLS provides information to brokers and real estate agents through

NorthstarMLS.  NorthstarMLS members enter into an agreement with RMLS to upload

their real estate listings to NorthstarMLS.  (Decl. of John Mosey ¶ 4, May 16, 2012,

Docket No. 18.)  The members upload photographs of a property, enter some factual

information, such as list price, and also select other items from a dropdown menu of "field descriptors" allegedly created by RMLS, such as "Main Floor Full Bath," "Private Master," and "Whirlpool." (*See* Decl. of Tim Schirm, Ex. C at 6, May 17, 2012, Docket No. 17.)  In return, RMLS sends to a member-broker's consumer-facing website an "IDX Data Feed" that includes the broker's own listings and the listings of all other NorthstarMLS members.  (Mosey Decl. ¶ 4.)  According to RMLS, brokers benefit from receiving the IDX Data Feed because potential buyers who visit a broker's website to view the listings may be persuaded to hire the broker and its agents.  (*Id.*)  Agents and brokers also use NorthstarMLS for access to real estate listings and information in their respective markets.  (Compl. ¶ 9.)  Further, RMLS makes available brokers' offers of cooperation, which are the commission splits that listing brokers will pay other brokers who represent a buyer.  (Countercl. ¶ 17.)

AHRN is a Delaware corporation, with its principal place of business in San Francisco, California.  (Decl. of Ali Vahabzadeh ¶¶ 1, 3–6, May 11, 2012, Docket No. 10.)  AHRN owns NeighborCity, an online residential real estate service.  (Supp. Decl. of Ali Vahabzadeh ¶ 3, June 7, 2012, Docket No. 26.)  NeighborCity offers three primary services to its visitors.  First, NeighborCity offers information to visitors about properties for sale, including listing prices, photographs, and descriptors of certain property features.  (Supp. Decl. of John Mosey, Ex. R, June 1, 2012, Docket No. 21.)  Second, NeighborCity connects prospective buyers with buy-side real estate agents.  (*See*

*id.*)[1]   The final service NeighborCity offers, through its AgentMatch software system, is providing performance metrics, rankings, and statistics regarding real estate agents to assist buyers in finding an effective agent.   (Vahabzadeh Decl. ¶ 8; Supp. Vahabzadeh Decl. ¶¶ 3-6.)

## II.   HISTORY OF THIS ACTION

RMLS alleges in its complaint that AHRN has willfully infringed RMLS's copyrighted material, including photographs and narrative descriptors on NorthstarMLS, by displaying this material on NeighborCity.   On September 27, 2012, this Court entered a preliminary injunction against AHRN.   *Reg'l Multiple Listing Serv. of Minn.*, 2012 WL 4470286, at *11.   The Court found that RMLS was likely to succeed on the merits of its copyright infringement claims against AHRN.   *Id.* at *7-10.   In reaching this holding, the Court first found that RMLS had shown a likelihood that it owned the fifty photographs and narrative descriptors underlying its complaint against AHRN.   *Id.* at *7-8.   There was a rebuttable presumption that RMLS owned copyrights to this material because the material was registered with the Copyright Office.   *Id.* at *8.   Because AHRN had not

---

[1] After an AHRN customer selects a real estate agent via NeighborCity, NeighborCity allows the customer to make contact with the agent via e-mail or text message without disclosing the customer's personal information.   (Countercl. ¶ 10.)   The first agent to connect with the customer has the "exclusive opportunity" to win that customer's business.   (*Id.*)   The customer decides whether to hire the agent after meeting or going on a property tour.   (*Id.*)   AHRN receives compensation by receiving thirty percent of the local agent's commissions in return for putting the agent in touch with the customer.   (*Id.* ¶¶ 11, 30.)

challenged this rebuttable presumption,[2] the Court found that RMLS had shown a likelihood that it owned these copyrights.  *Id.*  Next, the Court found that the fifty photographs and some of the narrative descriptors were likely copyrightable and that AHRN had likely copied these materials. *Id.* at *8-10.  Accordingly, the Court found that RMLS was likely to succeed in showing infringement of these copyrights.  The Court then analyzed the remaining factors relevant to a preliminary injunction and determined that an injunction was appropriate. *Id.* at *10-11.

As to the scope of the injunction, the Court stated:

> The Court must finally determine the scope of the preliminary injunction. The Court will issue a preliminary injunction prohibiting AHRN from copying all current and future photographs and any current and future "agent remarks" and "public remarks" found on NorthstarMLS **for which RMLS has a copyright**.  "**The power to grant injunctive relief is not limited to registered copyrights, or even to those copyrights which give rise to an infringement action**[,]" *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1349 (8th Cir.1994), and "[t]he weight of authority supports the extension of injunctive relief to future works[,]" *Princeton Univ. Press v. Mich. Doc. Servs., Inc.*, 99 F.3d 1381, 1392-93 (6th Cir. 1996).  Because of the widespread nature of AHRN's apparent copyright infringement and the threat of future infringement, the Court finds that an injunction enjoining the use of RMLS's **current and future copyrighted materials** is warranted.

*Id.* at *11 (emphases added).  The Court then ordered the following:

---

[2] As the Court stated in its order, "For the first time, at oral argument, AHRN questioned . . . whether the assignments of certain copyrights to RMLS were valid.  AHRN also stated, however, that its attacks on the ownership of the copyrights would inform the Court little on how it should handle the issues for preliminary injunction.  Because AHRN has not briefed these arguments and indicated that they were not relevant to the preliminary injunction, the Court will not address them in any detail, beyond stating that, at this stage, AHRN has not successfully rebutted RMLS's presumption that it owns the copyrights at issue." *Id.* at *8 n.11.

> Defendant, along with any of its officers, directors, subsidiaries, and successors, and all persons and entities acting in concert therewith, are immediately and until further order of this Court **PRELIMINARILY ENJOINED** from engaging in any unauthorized copying, display, use, and/or public distribution of Plaintiff's copyrighted photographic works, including, without limitation, the works covered by U.S. Copyright Reg. Nos. TX VA 1-432-912; VA 1-432-913; VA 1-432-914; and VA 1-432-917 . . . .

*Id.*

The Court also addressed the issue of which photographs on NorthstarMLS were owned by RMLS. The Court noted that RMLS had stated that it did not own copyrights to all of the photographs on NorthstarMLS. *Id.* at *2 n.3. It noted, however, "RMLS claims that it places watermarks on the photographs for which it owns copyrights." *Id.* The Court declined to delineate between those photographs that RMLS did or did not own, but stated that its injunction would "extend only insofar as copyrights are owned or co-owned by RMLS." *Id.*

After the entry of the Court's preliminary injunction order, Cardella submitted a declaration to this Court stating that AHRN "has ensured that its data gathering process does not copy, display, or permit public distribution of any of the data or other materials which are the subject of the Court's Order." (Decl. of Jonathan Cardella (First Cardella Decl.") ¶ 5, Oct. 16, 2012, Docket No. 44.)

## III.    BACKGROUND FOR SANCTIONS MOTION

The current sanctions motion before the Court is based on AHRN's publication, during the period from October 16, 2012 through October 23, 2012, of seventy-seven photographs allegedly subject to a copyright owned by RMLS. (Decl. of Michael

Bisping ("First Bisping Decl.") ¶ 3, Exs. 1-3, Nov. 15, 2012, Docket No. 51.)  These are different photographs than the fifty photographs that underlie the original complaint brought by RMLS.

According to RMLS, four real estate agents took the seventy-seven photographs at issue: John W. Anderson of Twin Oaks Realty, Inc. ("Twin Oaks"), Marty G. Ringham of Countryside Realty ("Countryside"), Claude A. Worrell of RE/MAX Results ("RE/MAX"), and Michael C. Olsen of Keller Williams Premier Realty ("Keller Williams").  (*See* Decl. of John W. Anderson ("Anderson Decl.") ¶ 2, Apr. 23, 2013, Docket No. 99; Decl. of Marty G. Ringham ("Ringham Decl.") ¶ 2, Apr. 23, 2013, Docket No. 100; Decl. of Claude A. Worrell ("Worrell Decl.") ¶ 2, Apr. 23, 2013, Docket No. 101; Decl. of Michael C. Olsen ("Olsen Decl.") ¶ 2, Apr. 23, 2013, Docket No. 102.)

These agents each confirm that, in 2007, prior to RMLS uploading their photographs to NorthstarMLS, they entered into a click-through RMLS Subscriber License and Access Agreement ("the Subscriber Agreement").  (Second Decl. of Michael Bisping ("Second Bisping Decl.") ¶ 3, Apr. 23, 2013, Docket No. 103; Anderson Decl. ¶ 3; Ringham Decl. ¶ 3; Worrell Decl. ¶ 3; Olsen Decl. ¶ 3.)  By accepting the terms of the Subscriber Agreement, each agent assigned all right, title, and interest in his NorthstarMLS contributions to his broker.  (First Bisping Decl., Ex. B.)  RMLS has also reviewed its electronic records and verified that each of the four agents clicked through

the Subscriber Agreement on or about August 16, 2007, the first day that the requirement of signing this agreement was put into place.[3]  (Second Bisping Decl. ¶ 6.)[4]

Each of the brokers for the four agents – Twin Oaks, Countryside, RE/MAX, and Keller Williams – entered into a Participant License and Access Agreement with RMLS ("the Participant Agreement").  (*See* First Bisping Decl., Exs. C1-C4.)   Under the Participant Agreement, each broker assigned to RMLS an undivided twenty-five percent interest in the copyrights for their photographic and other contributions to NorthstarMLS, including the contributions of their employees and contractors.  (*Id.*)[5]  In summary, then, RMLS claims that the copyrights in the seventy-seven photographs at issue were assigned by the photographers to the brokers and then assigned, in part, to RMLS.[6]

AHRN maintains that, even if RMLS can prove that it co-owns copyrights to the seventy-seven photographs, AHRN nonetheless had permission from Keller Williams and RE/MAX to display photographs from their NorthstarMLS listings.  As support, AHRN points to alleged agreements it has with Keller Williams and RE/MAX that state:

---

[3] RMLS does not maintain signed copies or paper records of the individual Subscriber Agreements, but it maintains computerized records that indicate whether an agent has accepted the Subscriber Agreement.  (*Id.* ¶ 5.)

[4] The four agents further stated that none of them gave permission to AHRN to reproduce, display, or use any of the photographs at issue.  (See Anderson Decl. ¶ 5; Ringham Decl. ¶ 6; Worrell Decl. ¶ 6; Olsen Decl. ¶ 6.)

[5] The Participant Agreement also stated that the broker "may make unfettered and unrestricted use of the [copyrighted item] in perpetuity."  (*Id.*)

[6] In addition, RMLS states that it likely has a copyright registration for the seventy-seven photographs.

> By signing this Agreement, you give [AHRN] consent to use your name and the information regarding Your listings and the transactions in which You have cooperated for promotional purposes on Our website(s).

(Decl. of Jonathan Cardella ("Second Cardella Decl.") ¶ 4, Ex. 1, Dec. 6, 2012, Docket No. 67.)  The alleged agreement between AHRN and RE/MAX is electronically signed by John Collopy and the alleged agreement between AHRN and Keller Williams is electronically signed by Michael C. Olsen.  (*Id.*)  The exact identities of John Collopy and Michael C. Olsen are unclear to the Court.

The Vice President of RE/MAX wrote a letter to AHRN's CEO dated January 8, 2013, denying that it ever entered into an agreement with AHRN and demanding immediate removal of any and all RE/MAX listings from AHRN's website.  (Decl. of Chad Snyder, Ex. A, Feb. 8, 2013, Docket No. 85.)  Specifically, the Vice President stated that he had reviewed the purported electronic contract between RE/MAX and AHRN and denied that the contract was signed by an officer of RE/MAX.  (*Id.*)

## IV.    BACKGROUND FOR COUNTERCLAIMS

AHRN brings counterclaims against RMLS alleging violations of the Sherman Act (Count 1), Minnesota Antitrust Law (Count 2), the Cartwright Act (Count 3), and the Minnesota Deceptive Trade Practices Act (Count 4).  (Countercl. ¶¶ 6-32.)  RMLS moves to dismiss each of these counterclaims.  The Court will outline below some of the primary allegations relevant to these counterclaims.

A.      **Agreement not to License Information to AHRN**

AHRN alleges that RMLS, other MLSs, the member-brokers of the MLSs, and the

NAR[7] have entered into a continuing agreement to suppress competition in at least two

ways.  (*Id.* ¶ 26.)  First, they have agreed to refuse to license AHRN access to data feeds

containing real estate listing data.  (*Id.*)  According to AHRN, information contained

within MLS databases is shared with third parties that are neither brokers nor members of

an MLS, but access is limited to only certain types of third parties.  (*See id.* ¶ 27.)  The

information is generally made available through data syndicators, such as Point2/Yardi

Systems, Inc. and ListHub/Threewide Corporation/Move, Inc. 28.  (*Id.*)  AHRN asserts,

upon information and belief, that RMLS sets restrictions on when the syndicator can

allow access to the data feeds and requires that the syndicator only grant access to third

parties that send customer leads directly to the agent or broker that listed the residential

property.  (*Id.* ¶ 28.)  In other words, RMLS will not allow syndicators to grant access to

third parties like AHRN that provide buyer-side referrals.  (*Id.*)  AHRN alleges that third-

party syndicators have informed AHRN of this policy when refusing to extend AHRN a

license.  (*Id.* ¶ 31.)  AHRN further alleges that there are no reasonable alternative sources

of complete real estate data other than from MLSs.  (*Id.* ¶ 10.)

AHRN claims that these restrictions on who may receive the data feeds are meant

to promote RMLS's anticompetitive business model.  AHRN claims that RMLS's model

---

[7] According to AHRN, the effort to restrict AHRN's participation in the market for real estate information and services has been coordinated, at least in part, and supported by the NAR, a trade association that, on information and belief, establishes and enforces policies for its individual members and promulgates rules governing the conduct of NAR-member MLSs – including RMLS.  (*Id.* ¶ 32.)

is designed to "maximize brokerage commissions through their own referrals and dual-agency home sales – arrangements in which the broker who lists a property is also the broker for the buyer of that property, and so is entitled to the entire commission for the sale, as well as the referral fee for directing the buyer to the listing and/or selling agent through the broker's website." (*Id.* ¶ 13.)  According to AHRN, because commissions are based on the sale price of the home, a broker and agent relying on dual agency have little incentive to negotiate in the interests of either the buyer or the seller, and both the buyer and the seller lose any right to independent advice and representation from the agent and broker. (*Id.* ¶ 28.)  AHRN claims that NeighborCity "threatens that model by connecting potential buyers directly with independent agents who do not face the conflict of interest inherent in dual-agency sales." (*Id.* ¶ 13.)

### B.    Agreement to Assert Sham Copyrights

Second, AHRN alleges that RMLS and other MLSs, including their member-brokers, have entered into a continuing agreement to assert sham copyright claims to real estate listing data, and to employ those sham copyright claims to intimidate businesses like AHRN that seek to compete with and challenge their existing business model. (*Id.* ¶ 26.)

AHRN claims that RMLS asserts copyrights over information that is "not copyrightable, not properly registered in compliance with the Copyright Act, or not

owned by" RMLS.  (*Id.* ¶ 42.)[8]  Specifically, AHRN claims that the narrative descriptors on RMLS's listing database are not based on RMLS's own creative efforts but on the creative efforts of a different company, Tarasoft.  (*Id.* ¶¶ 52, 54.)[9]  AHRN also asserts that RMLS does not have copyrights to all of the photographs upon which it places watermarks.  (*Id.* ¶ 55.)  Instead, it states "[o]n information and belief, RMLS has not received assignments of the copyrights to those photographs that meet the requirements of the Copyright Act, and has only even attempted to register the 50 photographs identified as the 'Photographic Works' in its complaint solely for the purpose of bringing this action against AHRN." (*Id.*)

To demonstrate a conspiracy regarding the sham copyrights, AHRN points to the November 11 to 14, 2011 NAR meeting that allegedly featured discussions regarding the perceived threat AHRN poses to the industry and what the industry could do to shut down AHRN.  (*Id.* ¶ 33.)  AHRN alleges that, following this meeting, AHRN received more than thirty similar cease and desist letters from MLSs and brokers across the country – including from RMLS.  (*Id.* ¶¶ 33-34.)  Each letter claimed that AHRN was

---

[8] At the 2012 Council of MLS meeting in Boston, AHRN alleges that a speaker told the attendees that it would be "extremely burdensome" if each "MLS must recognize every copyright element in the database to register." (*Id.* ¶ 43.)

[9] In 2011, Tarasoft was acquired by CoreLogic, which, on AHRN's information and belief, continues to develop and maintain software for RMLS and other MLSs around the country. (*Id.* ¶ 53.)

improperly using information over which each respective MLS claimed a copyright. (*Id.* ¶ 34.)[10]

AHRN further alleges a conspiracy based on the NAR Board's vote on Saturday, May 19, 2012, to institute new rules relevant to AHRN and to fund this legal action and a substantially similar action against AHRN in the United States District Court for the District of Maryland. (*Id.* ¶ 38.) Specifically, AHRN identifies the following statements in the meeting minutes as support:

> [A]pproved a set of comprehensive amendments to NAR's Internet Data Exchange (IDX) policy and MLS rules to clarify that "participant websites" are those in which MLS participants have actual and apparent control of the sites. . . . Control means participants can add, delete, modify, or update their information, and a reasonable consumer would recognize the information as the participants.

> Separately, the board acknowledged the growing complexity of MLS technology issues by creating an MLS Technology and Emerging Issues Subcommittee, which will anticipate and analyze MLS technology issues.

> Approved $161,667 in legal assistance for seven cases . . . challenging misappropriation of MLS data by a third-party Web site . . . .

(*Id.* ¶ 39.)

As further evidence of an alleged conspiracy, RMLS points to a December 22, 2011, email that John Mosey, the President of RMLS, sent to Mitchell Skinner, RMLS's counsel. (*Id.* ¶ 40.) Mosey's e-mail reads as follows:

> I was thinking more about this after our conversation with Laurie yesterday because I was left with a sense of nothing having changed.

---

[10] AHRN responded to each of these MLS letters with an offer to purchase a license to the disputed material. (*Id.* ¶ 35.) The MLSs refused to discuss a licensing agreement. (*Id.* ¶ 36.)

Across the country, multiple MLS's have howled about the injustice of it all, wagged their fingers at Mr. Cardella, called in the full force and fury of their respective legal advisors, dropped C&D's on the head of the bad fellow with the same effect as confetti and then we all shut down for the holidays.

If I were Mr. Cardella, I'd be thinking that we (the offended parties) are unconnected, unserious and more noise than threat. Ask Brian about the French guards in Monty Python and The Holy Grail as they rain insults down on Arthur.

If we don't have the standing to enforce the copyright as anticipated in the Access and License Agreements of those of our Participants who assigned us an interest for the very purpose defined by Neighborcity.com, what is the point of them?

How do we connect the dots between all of the MLS's that have been abused so that we can act collectively, either in cost sharing and/or strategically by taking an action against Mr. Cardella that has the desired outcomes of:

1. Getting all of our listings off of his site
2. Discovering where he has been getting the listings
3. Throwing a world of hurt on both
4. Sending a message that our copyrights are enforceable and we are serious about punishing anyone who doesn't take us seriously

JM

(*See* Pl.'s Mem. in Supp. of Mot. to Dismiss First Am. Countercl., Ex. A, Jan. 11, 2013,

Docket No. 81.)[11]

---

[11] Although the complaint did not include the text of the entire e-mail, the Court may consider the e-mail in its entirety because it may consider material necessarily embraced by the complaint on a motion to dismiss. *See Enervations, Inc. v. Minn. Mining and Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004).

**ANALYSIS**

## I.   MOTION FOR CONTEMPT

### A.   Standard of Review

The Court will first discuss RMLS's motion for contempt against AHRN and Cardella.  "One of the overarching goals of a court's contempt power is to ensure that litigants do not anoint themselves with the power to adjudge the validity of orders to which they are subject." *Chicago Truck Drivers Union Pension Fund v. Brotherhood Labor Leasing*, 207 F.3d 500, 504 (8th Cir. 2000).  "A party seeking civil contempt bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnors violated a court order." *Id.* at 505.

If the moving party satisfies its initial burden, the burden shifts to the alleged contemnor to show inability to comply. *Id.*  To meet this burden, the alleged contemnor must do more than simply assert a present inability, and must instead establish: "(1) that they were unable to comply, explaining why categorically and in detail; (2) that their inability to comply was not self-induced; and (3) that they made in good faith all reasonable efforts to comply." *Id.* at 506 (citations and internal quotation marks omitted).

### B.   Violation of Court's Order

The Court must first determine if RMLS has proven, by clear and convincing evidence, that AHRN violated the preliminary injunction.  To determine if AHRN violated the injunction, the Court must decide if the copyrights at issue were owned by RMLS, if AHRN displayed the copyrighted material, and if AHRN's display of the copyrighted material was authorized.  Considering these factors, the Court finds that

RMLS has proven that AHRN violated the preliminary injunction as to the photographs taken by John W. Anderson of Twin Oaks and Marty G. Ringham of Countryside.

First, RMLS has shown that it co-owns the seventy-seven copyrighted photographs. It has introduced evidence that four real estate agents took these photographs. These four agents were thus the original copyright holders to the photographs. *See Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1008 (N.D. Ill. 2000); United States Copyright Office, Copyright Basics Circular 1 at 2 (May 5, 2012), http://www.copyright.gov/circs/circ01.pdf ("The copyright in the work of authorship immediately becomes the property of the author who created the work."). These real estate agents attested in affidavits to this Court that they assigned their interest in the photographs to their brokers.[12] Those brokers then assigned a partial interest in the copyrights to RMLS. Thus, RMLS has shown that it co-owns copyrights in the seventy-seven photographs. RMLS has also shown through exhibits that AHRN displayed the seventy-seven copyrighted photographs after the Court's entry of the preliminary injunction.

The question thus becomes if AHRN's display of the photographs was unauthorized, as the preliminary injunction order only enjoined the "unauthorized"

---

[12] In addition, RMLS submitted a copy of the Subscriber Agreement that each of the four agents electronically signed, agreeing to assign their copyrights to their brokers. At oral argument, AHRN disputed that electronic signatures were sufficient to confer an interest in the copyrights. *See* 17 U.S.C. § 204(a). The Court finds that electronic signatures can be sufficient to transfer a copyright. *See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, --- F. Supp. 2d ---, 2012 WL 5503513, at *5-6 (D. Md. 2012). Here, reviewing the record as a whole, the Court finds that there is sufficient evidence that the agents transferred their copyrights to their brokers.

copying, displaying, use, and/or public distribution of RMLS's copyrighted photographic works. *See Reg'l Multiple Listing Serv. of Minn.*, 2012 WL 4470286, at *11.  The Court finds that RMLS has not shown by clear and convincing evidence that AHRN's display of RE/MAX and Keller Williams's photographs was unauthorized.  As stated above, AHRN claims that it had agreements with John Collopy of RE/MAX and Michael C. Olsen of Keller Williams to display photographs and other listing information from RE/MAX and Keller Williams.  The Court notes that it is unclear at this stage if John Collopy or Michael C. Olsen had the authority to sign such agreements with AHRN, and RMLS has not provided any information about the identity of these individuals.[13]  The Court also notes that it is unclear whether these agreements, assuming they amount to proper authorization, cover the photographs at issue.[14]  Nonetheless, RMLS has the burden to show that AHRN violated the preliminary injunction order by clear and convincing evidence, and given the existence of these purported agreements, the Court

---

[13] For example, it is unclear if the Michael C. Olsen who allegedly signed the agreement with AHRN is the same person who took the Keller Williams photographs that are subject to this contempt motion.

[14] RMLS argues that the alleged agreements between AHRN and these brokers do not give AHRN permission to use the brokers' photographs because they merely allow use of the brokers' "name[s] and information regarding [the brokers'] listings."  According to RMLS, this language only allows AHRN to display basic factual information about listings and does not allow the display of photographs.  The Court declines to interpret this contractual language at this time, other than to hold that the language does not unambiguously apply only to basic factual information.

finds that RMLS has not met that burden at this stage for the photographs of RE/MAX and Keller Williams.[15]

The photographs by Twin Oaks and Countryside are another matter.  There is no evidence that AHRN had permission from Twin Oaks or Countryside to display their copyrighted photographs.   The Court finds that, by displaying Twin Oaks and Countryside photographs that are copyrighted by RMLS without permission from any copyright holder, AHRN violated this Court's order.   The Court's order prohibited AHRN from displaying the "Plaintiff's **copyrighted photographic works**, including, **without limitation**" certain listed photographs.  *Reg'l Multiple Listing Serv. of Minn.*, 2012 WL 4470286, at *11 (emphases added).  The Court made the extent of its injunction even clearer by stating that it was prohibiting "AHRN from copying all current and future photographs . . . for which RMLS has a copyright" and that it was "enjoining the use of RMLS's current and future copyrighted materials[.]"  *Id.*   Contrary to AHRN's assertions, the order said nothing about the injunction extending only to copyrights registered with the Copyright Office.[16]   Rather, when explaining the scope of its injunction, the Court noted that "[t]he power to grant injunctive relief is not limited to

---

[15] It appears that RE/MAX may have now terminated any agreement it had with AHRN through a letter dated January 8, 2013.  Because the motion for contempt was filed on November 15, 2012, the Court will not consider the January 8 letter for purposes of this motion.

[16] Copyright protection exists once a work is fixed in a tangible form of expression.  17 U.S.C. § 102(a).  Neither publication nor registration is required to secure a copyright. *Id.* § 408.

registered copyrights." *Id.* (internal quotation marks omitted).[17]   Accordingly, AHRN was under the obligation not to display any of RMLS's copyrighted photographic works without proper authorization.

Because AHRN has displayed Twin Oaks and Countryside photographs that are copyrighted by RMLS, AHRN is in violation of this Court's order.   AHRN has also published a false statement to this Court by stating that AHRN "has ensured that its data gathering process does not copy, display, or permit public distribution of any of the data or other materials which are the subject of the Court's Order."   (First Cardella Decl. ¶ 5.) In addition, the Court notes that AHRN has continued to display at least one of the photographs that was specifically listed as subject to the Court's original preliminary injunction order.   (Second Bisping Decl. ¶ 9, Ex. 3; *see also* Letter to District Judge, Apr. 26, 2013, Docket No. 105.)   Based on the current record, then, the Court finds that AHRN is in violation of the Court's order because it has displayed RMLS's copyrighted material.

### C.     Finding of Contempt

Because AHRN has violated this Court's order, the Court must next decide if AHRN should be found in contempt.   As noted above, at this point, the burden shifts to AHRN to show an inability to comply with this Court's order.   *See Chicago Truck Drivers*, 207 F.3d at 505.   The Court finds that AHRN has not met this burden.

---

[17] The Court also did not limit the order to the publication of photographs that contained a watermark, although the Court noted that RMLS had indicated that it placed a watermark on all copyrighted photographs. *See id.* at *2 n.3.

First, AHRN was required to show that it was unable to comply with the Court's order, "explaining why categorically and in detail[.]"  *See id.* at 506.  AHRN has not done so.  In fact, at oral argument, the Court asked AHRN's attorney if AHRN was claiming an inability to comply, and AHRN's attorney responded that he did not know whether AHRN had the technological ability to comply with the Court's order.  AHRN has thus not argued to this Court that it was unable to comply with the order, much less categorically and in detail.  AHRN has the burden to explain why it could not comply with the Court's order, and it has not done so.

Furthermore, AHRN has not shown that it "made in good faith all reasonable efforts to comply" with the Court's order.  *See id.*  AHRN has never contacted this Court for any clarification of its order, and it never complained that it was unable to carry out this Court's order because it could not determine which photographs on NorthstarMLS were subject to an RMLS copyright.  *See Chase Indus., Inc., Durus Div. v. Frommelt Indus., Inc.*, 806 F. Supp. 1381, 1386 (N.D. Iowa 1992) ("The burden of avoiding infringement at the risk of contempt falls upon the one enjoined." (internal quotation marks omitted)).  Accordingly, AHRN has not met its burden to show inability to comply with the Court's order and sanctions against AHRN are appropriate.

The Court must also determine whether to hold Cardella in contempt.  "[A] court's contempt power extends to non-parties who have notice of the court's order and the responsibility to comply with it."  *Chicago Truck Drivers*, 207 F.3d at 507.  "[W]hile no court can make a decree that binds the world at large, a non-party may be punished if he either abets the defendant or is legally identified with him."  *Id.* (internal quotation marks

omitted). Although Cardella is the CEO of AHRN, the Court finds insufficient evidence in the record at this time to determine that Cardella abetted AHRN or that he is sufficiently identified with AHRN to be subject to contempt. Accordingly, the Court will find AHRN, but not Cardella, in contempt.

### D.    Sanctions

The Court must thus determine the appropriate sanctions against AHRN. "Civil contempt may be employed either to coerce the defendant into compliance with a court order or to compensate the complainant for losses sustained, or both." *Id.* at 505. A contempt sanction is considered "civil if it is remedial, and for the benefit of the complainant." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) (internal quotation marks omitted).

The Court will award RMLS its reasonable fees and costs incurred in bringing this motion. *See Jake's, Ltd. v. City of Coates*, 356 F.3d 896, 900 (8th Cir. 2004) ("[A]n award of reasonable attorney's fees and expenses incurred by [the aggrieved party] in seeking to enforce the decree is a form of compensatory relief that is well within a district court's remedial discretion in civil contempt proceedings."). Because of AHRN's violation of this Court's order, the Court deems it appropriate to compensate RMLS for the reasonable fees and costs it has incurred.

The Court will not award RMLS other compensatory damages, however, because there is insufficient information in the record regarding RMLS's actual loss. Compensatory damages "must of course be based on evidence of complainant's actual loss." *United States v. United Mine Workers*, 330 U.S. 258, 304 (1947). Here, RMLS

has not shown actual loss from AHRN's continued publication of the Twin Oaks and Countryside photographs, beyond pointing to the Court's preliminary injunction order. While the Court found a significant threat of irreparable harm in its injunction order, it did not find actual harm. *See Reg'l Multiple Listing Serv. of Minn.*, 2012 WL 4470286, at *10. Accordingly, without additional evidence of actual harm, the Court declines to award compensatory damages.

The Court will also decline to award sanctions to ensure compliance. In awarding a sanction for compliance,

> [t]he court should determine the amount of the sanction only after considering the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about the result desired, and the amount of the contemnor's financial resources and the consequent seriousness of the burden to that particular party.

*Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1224 (8th Cir. 2006) (internal citations and quotation marks omitted). Much of the information that the Court would consider in determining the amount of sanctions to ensure compliance – such as the magnitude of harm caused by infringing the copyrights and the financial resources of AHRN – is not available in the record. Furthermore, the Court finds that sanctions are unnecessary to ensure compliance at this time. However, if AHRN continues to violate this Court's order and a subsequent motion for contempt is filed, the Court is likely to award sanctions to ensure compliance.

## E.    Preliminary Injunction Order

As stated above, AHRN has not met its burden of showing that it is unable to comply with this Court's order or that it made in good faith all reasonable efforts to comply with the order.  Based on the information that has now been presented, however, the Court is nonetheless concerned that AHRN may find it difficult to determine which of the photographs on NorthstarMLS are subject to a copyright by RMLS.  In its original preliminary injunction order, the Court noted that "RMLS claims that it places watermarks on the photographs for which it owns copyrights."  *See Reg'l Multiple Listing Serv. of Minn.*, 2012 WL 4470286, at *2 n.3.  It is now apparent, however, that RMLS does not place watermarks on all of the NorthstarMLS photographs that RMLS claims are copyrighted.  Indeed, not all of the seventy-seven photographs subject to the contempt motion contained a watermark.[18]

Because this Court's order extends only to RMLS's copyrighted material, the Court will modify its preliminary injunction order to make clearer which photographs must be removed from NeighborCity.  The Court will order that, within thirty days, RMLS place NorthstarMLS watermarks on all of the photographs on NorthstarMLS that are subject to a copyright owned or co-owned by RMLS.  RMLS must not include a

---

[18] As the Court stated above, the Court's order was not limited to photographs containing a watermark.  However, in determining the amount of sanctions, the Court has considered that a number of the photographs that AHRN displayed did not contain a watermark and that AHRN could have possibly been under the false impression that RMLS did not possess a copyright to these photographs.  Accordingly, the Court has not imposed sanctions for the publication of any of the photographs without watermarks.

NorthstarMLS watermark on photographs for which it does not own a copyright.[19]  No later than forty-five days after the entry of this order, AHRN must then remove all photographs from NeighborCity that are subject to an RMLS copyright, as indicated by RMLS's placement of watermarks on the photographs.[20]

## II.     MOTION TO DISMISS

The Court will next address RMLS's motion to dismiss.  First, the Court will explain why it will not dismiss AHRN's Sherman Act counterclaim.  Second, for the same reasons, the Court will not dismiss AHRN's state law antitrust counterclaims. Finally, the Court will explain why it will not dismiss AHRN's counterclaim under the Minnesota Deceptive Trade Practices Act ("MDPTA").

### A.     Sherman Act

RMLS first moves to dismiss AHRN's Sherman Act counterclaim.  Under this claim, AHRN alleges that there is a conspiracy among RMLS, the NAR, other MLSs, and member-brokers of RMLS to unreasonably restrain trade.  The claim alleges that this scheme of restraint of trade was effectuated in two main ways: (1) a "group boycott," that

---

[19] RMLS argues that AHRN is prohibited from displaying photographs for which other parties hold copyrights and therefore must not display any photographs on NorthstarMLS without permission from a copyright holder.  However, RMLS also admits that it has no standing to protect copyrighted images that it does not own.  Because this Court's order extends only to prohibiting AHRN from displaying copyrights owned by RMLS, RMLS must make clear which copyrights on NorthstarMLS are in fact owned by RMLS.

[20] The exception to this dictate is if AHRN obtains legal permission from a copyright holder, such as a member-broker of RMLS that owns a partial interest in a copyright, to display a photograph.

is, the concerted effort to refuse to engage in good faith negotiation with AHRN on licensing agreements for the data in real estate listing databases; and (2) the coordinated assertion of invalid copyright claims for the purpose of suppressing competition in the market for real estate brokerage referrals and the market for real estate agent services. AHRN alleges that this behavior has damaged AHRN because RMLS dissuades brokers and agents within RMLS's service area from entering referral agreements with AHRN and prohibits AHRN's access to information about properties on the market. AHRN further alleges that RMLS's anticompetitive conduct causes harm to consumers in the real estate market by suppressing information about and access to agents who are independent of listing brokers and agents and discouraging price competition for brokerage services and for home prices.

RMLS responds that it is protected by the *Noerr-Pennington* doctrine and that AHRN has not properly alleged the substantive elements of the Sherman Act. The Court will reject these arguments and deny RMLS's motion to dismiss for the reasons outlined below.

### 1. *Noerr-Pennington* Doctrine

RMLS argues that the Sherman Act claim must be dismissed because RMLS is protected by the *Noerr-Pennington* doctrine. The *Noerr-Pennington* doctrine "is a defense to liability premised on the defendant's actions of exercising his own private rights to free speech and to petition the government." *Hinshaw v. Smith*, 436 F.3d 997, 1003 (8th Cir. 2006). Because "[t]he right to petition means more than simply the right to communicate directly with the government," the *Noerr-Pennington* doctrine "necessarily

includes those activities reasonably and normally attendant to effective petitioning." *In re IBP Confidential Bus. Documents Litig.*, 755 F.2d 1300, 1310 (8th Cir. 1985). "[T]he First Amendment generally immunizes the act of filing a lawsuit from tort liability under the *Noerr-Pennington* doctrine." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1080 n.4 (8th Cir. 1999). The doctrine can also immunize pre-suit activities such as cease and desist letters and settlement offers. *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 100 (2d Cir. 2000); *Select Comfort Corp. v. Sleep Better Store, LLC*, 838 F. Supp. 2d 889, 897-98 (D. Minn. 2012).

RMLS contends that all of AHRN's allegations under the Sherman Act counterclaim describe petitioning activity under the *Noerr-Pennington* doctrine. These activities include RMLS filing the complaint in this action, sending cease and desist letters regarding the copyrights identified in this action and regarding other copyrights, and refusing to grant AHRN a license to its copyrighted material.[21] The Court will assume without deciding that all of RMLS's alleged activities were reasonably and normally attendant to effective petitioning and could thus be protected by the *Noerr-Pennington* doctrine.

The question then becomes whether these petitioning activities were properly alleged to be "sham and in fact solely intended to cause injury to competitors rather than to obtain governmental action." *See South Dakota v. Kansas City S. Indus., Inc.*, 880

---

[21] RMLS argues that AHRN's offer to purchase licenses from MLSs after receiving cease and desist letters amounted to an offer to settle the parties' developing dispute and therefore that the failure to grant these licenses is enveloped in the *Noerr-Pennington* doctrine.

F.2d 40, 50-51 (8th Cir. 1989) (internal quotation marks omitted).  The sham exception applies where a defendant's petitioning activities are "so clearly baseless as to amount to an abuse of process."  *Id.* at 51.  "The sham exception is narrow, and the . . . party attempting to invoke the exception bears a heavy burden of demonstrating that the [activities are] objectively meritless."  *CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.*, 259 F.R.D. 398, 413 (D. Minn. 2009) (internal quotation marks omitted).

There is a two-part definition of sham petitioning activities.  *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993).  First, the activities must be objectively baseless in the sense that no reasonable person could realistically expect success on the merits of the right claimed.  *Id.*  The existence of probable cause to institute legal proceedings precludes a finding that a party has engaged in sham petitioning activities related to that litigation.  *Id.* at 63.  Second, if the petitioning activities are objectively meritless, a court must examine the party's subjective motivation.  *Id.* at 60.  Under this second prong, the Court focuses on whether the baseless activities conceal an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process as an anticompetitive weapon.  *Id.* at 61-62; *see also Porous Media Corp.*, 186 F.3d at 1080 n.4.

Whether a petitioning activity is objectively baseless for *Noerr-Pennington* purposes may be decided as a question of law.  *See, e.g.*, *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005).  However, a denial of a motion to dismiss

is appropriate if the plaintiff has properly alleged that a defendant's activities were a sham.[22]

In this case, the Court finds that AHRN has sufficiently alleged that RMLS's petitioning activities were a sham.  For example, AHRN alleges that, in the instant action, RMLS has asserted a copyright over the manner in which the facts and data are compiled on NorthstarMLS, even though the RMLS database is built on software RMLS did not design and does not own.[23]  AHRN also alleges that RMLS did not take the photographs over which it claims copyrights, and that it did not obtain the written assignments of these copyrights from the photographers that are required under the Copyright Act.  These allegations, if true, could show that RMLS's threats and pursuit of litigation against AHRN were in fact a sham.

RMLS argues that its petitioning activities cannot be viewed as a sham because the Court issued a preliminary injunction in its favor.  The Court rejects this argument at this stage of this litigation.  The issue of whether RMLS in fact owned the copyrights underlying this action was not challenged at the preliminary injunction stage, and it is possible that AHRN will ultimately prove that RMLS does not own these copyrights.  *See FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 938 (Fed. Cir. 1995) (stating that even a successful preliminary injunction "does not necessarily preclude a court from concluding

---

[22] *See, e.g., Sunergy Cmtys., Inc. v. Aristek Props., Ltd.*, 535 F. Supp. 1327, 1331 (D. Colo. 1982); *see also In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 362 (D. Mass. 2004).

[23] This argument was not presented to the Court prior to its entry of the preliminary injunction order.

that litigation was baseless"). Furthermore, AHRN has alleged a broad pattern of asserting sham copyrights beyond the copyrighted material specifically identified in this action. Accordingly, the Court will not dismiss AHRN's counterclaim under the *Noerr-Pennington* doctrine at this early stage.

### 2.    Substantive Elements of Sherman Act Claim

RMLS next argues that the Court should dismiss AHRN's counterclaim because AHRN has not adequately alleged the elements of a Sherman Act violation. Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a claim under Section 1 of the Sherman Act a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce. *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009).

RMLS challenges AHRN's counterclaim on several grounds. First, RMLS claims that AHRN has failed to allege a plausible conspiracy among RMLS, other MLSs, and the NAR. Second, RMLS argues that AHRN has failed to allege a conspiracy among RMLS and its member-brokers. Third, RMLS argues that AHRN has not alleged an unreasonable restraint in trade under (1) the per se rule or (2) the rule of reason. The Court will not dismiss AHRN's counterclaim on these grounds, for the reasons explained below.

### a.   Plausible Conspiracy

RMLS argues that AHRN cannot demonstrate the first element of a Sherman Act claim, that there was a contract, combination, or conspiracy.  To establish this element, the plaintiff must demonstrate concerted, as opposed to unilateral, action.  *Willman v. Heartland Hosp. E.*, 34 F.3d 605, 610 (8th Cir. 1994).  "The antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that [the defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks omitted); *see also Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 704 (D. Minn. 1998) (quoting *Monsanto*, 465 U.S. at 768).  As the Supreme Court stated in *Bell Atlantic Corp. v. Twombly*:

> [L]awful parallel conduct fails to bespeak unlawful agreement.  It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

550 U.S. 544, 556-67 (2007).  Furthermore, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

### (1) Conspiracy among RMLS, other MLSs, and the NAR

RMLS argues that AHRN has not alleged a plausible conspiracy among RMLS, other MLSs, and the NAR.  Specifically, RMLS contends that AHRN's allegations about a conspiracy among these entities is merely indicative of "lawful parallel conduct" under *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 556-67.

The Court finds that AHRN's counterclaim provides a "suggestion of a preceding agreement" and thus satisfies the *Twombly* standard for alleging a conspiracy among RMLS, other MLSs, and the NAR.  *See Twombly*, 550 U.S. at 556-67.  First, AHRN alleges that it received thirty similar cease and desist letters after NAR held its annual meeting in California.  AHRN alleges that, at this meeting, there were discussions regarding the perceived threat that AHRN posed to the industry and what the industry could do to shut down AHRN.  These allegations create a plausible relationship between the NAR meeting and the cease and desist letters.  Second, AHRN alleges that Mosey sent an e-mail suggesting that AHRN should not think that MLSs were "unconnected, unserious, and more noise than threat."  This e-mail could further suggest an agreement between RMLS and other MLSs.[24]  Third, AHRN alleges that NAR voted at a later meeting to fund this action and other legal actions and adopted exclusionary rules.  This

---

[24] RMLS argues that Mosey's e-mail is irrelevant because it was sent in December 2011, **after** RMLS (and other MLSs) had sent a cease and desist letter to AHRN.  However, the e-mail could contemplate that MLSs have acted in concert before, because Mosey states, "If I were Mr. Cardella, I'd be thinking that we (the offended parties) are unconnected, unserious and more noise than threat."  Furthermore, this e-mail took place before the NAR meeting that funded this action and other legal actions and adopted allegedly exclusionary rules.  Accordingly, the Court finds at this stage that the allegations regarding Mosey's e-mail could raise a suggestion of an agreement.

allegation further supports the possibility of an agreement to pursue concerted action. Fourth, when AHRN approached third-party syndicators – through whom RMLS and other MLSs license the use of their data to other websites – it was allegedly told that the syndicators were not permitted to extend a license to AHRN because AHRN did not direct potential home buyers to a listing broker's website. This allegation also raises the possibility of an agreement to pursue concerted action by suggesting that RMLS and other MLSs may have instructed third-party syndicators not to deal with companies who did not comply with their preferred business model. At this stage, the Court therefore finds that AHRN has sufficiently alleged a preceding agreement to engage in concerted action. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) ("[T]o present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment.").

RMLS further argues that the MLSs' conduct of sending cease and desist letters and not licensing their content to AHRN is as consistent with their unilateral interests in protecting their copyrighted material as it is with collective action. *See Willman*, 34 F.3d at 611 ("Conduct that is as consistent with a lawful motive as with an unlawful motive, standing alone, does not support the inference of an antitrust conspiracy."). The Court will not dismiss the counterclaim on this basis, however, because it is unclear if RMLS in fact owns copyrights to the majority of the material that it claims.

Finally, RMLS argues that it is inappropriate that AHRN states certain allegations "on information and belief." "[A]llegations 'upon information and belief' may state a claim after *Iqbal* and *Twombly*, [but] a claim must still be based on factual content that makes liability plausible, and not be formulaic recitations of the elements of a cause of action." *Klohs v. Wells Fargo Bank, NA*, --- F. Supp. 2d ----, 2012 WL 4758126, at *5 n.2 (D. Haw. 2012) (internal quotation marks omitted). The Court finds that AHRN has alleged enough factual content to make liability plausible, for the reasons explained above. Accordingly, the Court finds that AHRN has adequately alleged a conspiracy among RMLS, other MLSs, and the NAR.

### (2)    Conspiracy among RMLS and its Member-Brokers

RMLS also claims that AHRN has not plausibly alleged a conspiracy between RMLS and its member-brokers because AHRN has not alleged the existence of concerted action. *See Am. Needle, Inc. v. Nat'l Football League*, 130 S. Ct. 2201, 2209 (2010) ("[A]n arrangement must embody concerted action in order to be a . . . conspiracy under § 1." (internal quotation marks omitted)). For concerted action to exist, there must be a conspiracy between separate economic actors pursuing separate economic interests[25] such that the agreement "deprives the marketplace of independent centers of decisionmaking."

---

[25] To be capable of conspiring under § 1, entities must be "separate economic actors pursuing separate economic interests." *See Am. Needle*, 130 S. Ct. at 2212, 2215 (internal quotation marks omitted); (Countercl. ¶ 14). Courts have recognized that MLSs and their member-brokers can meet this standard and thus form a conspiracy. *See, e.g.*, *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 285-86 (4th Cir. 2012). AHRN has sufficiently alleged that the broker-members of RMLS are "separate economic actors pursuing separate economic interests" sufficient to potentially subject agreements between RMLS and its member-brokers to § 1.

*Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 285 (4th Cir. 2012) (quoting *Am. Needle*, 130 S. Ct. at 2212). The Court must determine, then, if RMLS has alleged that there was a conspiracy that deprived the marketplace of independent centers of decisionmaking.

RMLS claims that the alleged conspiracy between it and its member-brokers did not deprive the marketplace of independent centers of decisionmaking because RMLS's relationships with its member-brokers are governed by an agreement under which brokers "may make unfettered and unrestricted use of the [content related to their own NorthstarMLS listings] in perpetuity." (*See* Decl. of John Mosey, Ex. A at 2, May 17, 2012, Docket No. 18.) Brokers are therefore free to license their own listings to anyone, including AHRN. (*See id.*) Indeed, AHRN has stated that it has entered into licensing agreements with over 180 Minnesota brokers and agents, even though RMLS has declined to license AHRN. (*See* Second Cardella Decl. ¶ 4.) Accordingly, RMLS argues that the actions of it and its member-brokers do not deprive the marketplace of independent centers of decisionmaking and therefore do not violate § 1. *See Am. Needle, Inc.*, 130 S. Ct. at 2212.

The Court need not, of course, decide at this stage whether the conduct of RMLS and its member-brokers in fact deprived the marketplace of independent centers of decisionmaking. The Court finds that AHRN has sufficiently alleged this element, however. The gravamen of AHRN's counterclaim is that RMLS and its member-brokers colluded to use RMLS as a vehicle to assert false copyright claims that impeded AHRN's business model and to exclude companies like AHRN from accessing the universe of

listings needed to compete. *See Sea Pines Real Estate Cos.*, 679 F.3d at 285. Furthermore, AHRN has alleged that RMLS and its member-brokers dissuaded brokers and agents within RMLS's service area from entering referral agreements with AHRN. Through these allegations, AHRN has sufficiently alleged that RMLS and its co-conspirators engaged in concerted action under the Sherman Act.

### b.    Unreasonable Restraint of Trade

RMLS next argues that AHRN has not alleged an unreasonable restraint in trade. As stated above, the second element of a Sherman Act claim is that that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis. *See, e.g.*, *Insignia Sys., Inc.*, 661 F. Supp. 2d at 1062. For the reasons outlined below, the Court finds that AHRN has alleged an agreement that unreasonably restrained trade under both a per se rule of illegality and a rule of reason analysis.

### (1)    Per Se Rule

First, the Court must consider if AHRN has sufficiently alleged that RMLS's conduct runs afoul of a per se rule of illegality. AHRN alleges that its group boycott claim satisfies this per se rule by alleging a concerted refusal to deal by RMLS and its co-conspirators that is, by its very nature, restrictive of competition.

Most agreements under the Sherman Act are evaluated under the rule of reason, a standard that asks whether the alleged contract or agreement unreasonably restrains trade in a relevant product or geographic market. *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 659 (8th Cir. 2000). Certain kinds of agreements, however, are

considered unlawful per se because they are of a type that is so often harmful and so rarely justified that proof of anti-competitiveness is not required.  *Id.* (quoting *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998)).  "Under the per se standard, conduct that is manifestly anticompetitive or would always or almost always tend to restrict competition is conclusively presumed to unreasonably restrain competition without elaborate inquiry as to the precise harm it has caused or the business excuse for its use." *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 (3d Cir. 1998) (internal quotation marks and citations omitted).  Courts should apply "the per se rule to a business practice only when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output."  *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 591 (8th Cir. 1987) (internal quotation marks omitted).

A "group boycott" is a narrow category of per se violation.  Group boycotts justify the per se designation where "the boycott . . . cut[s] off access to a supply, facility, or market necessary to enable the boycotted firm to compete[,]" "the boycotting firms possess[] a dominant position in the relevant market," and "the challenged practices are generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive."  *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (internal quotation marks omitted). "The economic consequences of a 'group boycott' are that distinct economic entities no longer maintain the independence which is essential for the functioning of a free market." *Worthen Bank & Trust Co. v. Nat'l BankAmericard Inc.*, 485 F.2d 119, 125 (8th Cir.

1973). "Precedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors." *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 852 n.3 (8th Cir. 2000) (internal quotation marks omitted).

The Court finds, at this stage, that AHRN has sufficiently alleged a group boycott that amounts to a per se violation. First, AHRN alleges that RMLS and its co-conspirators cut off access to the "supply . . . necessary to enable the boycotted firm to compete." *See Nw. Wholesale*, 472 U.S. at 294. Specifically, AHRN alleges that RMLS and its co-conspirators have cut off access to information that is critical to any business attempting to compete with them. These allegations satisfy the element of cutting off a supply necessary for AHRN and similar businesses to compete.

Second, AHRN has alleged that "the boycotting firms possessed a dominant position in the relevant market." *See id.* As noted above, AHRN alleges that there is no practical way for it to compete without licensing information directly from RMLS because RMLS and its co-conspirators dominate the market and information regarding home listings. *See Sea Pines Real Estate*, 679 F.3d at 282 ("Particularly in an area served by only one MLS, access to MLS resources may be critical for a brokerage referrals service to successfully participate in the relevant real estate market.").

Third, AHRN has alleged that the challenged practices were "not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *See Nw. Wholesale*, 472 U.S. at 294. AHRN alleges that RMLS will only deal with competitors who comply with the business model of referring customers to listing brokers, which is allegedly intended to increase member-brokers'

profits at the expense of competitors and is not intended to enhance overall efficiency or to make markets more competitive. These allegations are sufficient to raise a per se violation claim. *See Primetime 24 Joint Venture*, 219 F.3d at 103 ("A concerted refusal to license copyrighted programming . . . in order to prevent competition from it is a boycott that, if proven, violates the Sherman Act.").

It may become apparent at a later stage in the litigation that a per se rule does not apply to AHRN's Sherman Act counterclaim if, for example, the behavior of RMLS and its co-conspirators in fact has advantages for the market. *See, e.g.*, *Sea Pines Real Estate*, 679 F.3d at 290 ("[T]he rule of reason [is] traditionally applied to joint venture cooperation that has possible procompetitive justifications."). However, at this very preliminary stage, the Court finds that AHRN has sufficiently pled a per se group boycott violation.[26]

### (2)    Rule of Reason

The Court will next consider, assuming that a per se violation does not apply, whether AHRN's allegations can withstand the rule of reason. Under a rule-of-reason analysis, AHRN must allege that:

---

[26] RMLS argues that the per se rule cannot apply because there is no horizontal agreement among direct competitors. *See Brookins*, 219 F.3d at 852 n.3. As support, RMLS argues that MLSs, which operate in different geographical areas, are not competitors of one another. *See NYNEX Corp.*, 525 U.S. at 135 ("[P]recedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors."). The Court finds that it is premature to determine the nature of the relationship among the alleged co-conspirators and whether they are in fact competitors. Furthermore, AHRN has also alleged a conspiracy among member-brokers and RMLS, who may be competitors.

(1) the defendants contracted, combined or conspired among each other; (2) the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) the objects of and conduct pursuant to that contract or conspiracy were illegal; and (4) the plaintiff was injured as a proximate result of that conspiracy.

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (internal quotations omitted).   When assessing the legality of an alleged § 1 violation under the rule of reason, the Court focuses on whether the defendant's conduct had detrimental effects on competition.   *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993).   RMLS argues that AHRN has failed to plead anticompetitive effects and cannot show an antitrust injury.

A plaintiff may demonstrate detrimental effects in two ways: by delineating "a relevant market and show[ing] that the defendant has enough market power to significantly impinge on competition" or by demonstrating "that the challenged practice has actually produced significant anti-competitive effects."   *Minn. Ass'n of Nurse Anesthetists*, 5 F. Supp. 2d at 706-07; *see also F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986).   "Either showing – market power or actual detrimental effects – shifts the burden to the defendant to demonstrate pro-competitive effects."   *Flegel*, 4 F.3d at 688.   "If the defendant satisfies this burden, the burden then shifts back to the plaintiff to demonstrate that any legitimate objectives could be achieved through substantially less restrictive means."   *Minn. Ass'n of Nurse Anesthetists*, 5 F. Supp. 2d at 707.   "The court then weighs the benefits and detriments to determine if the conduct is reasonable on balance."   *Id.* (internal quotation marks omitted).

"Significant anti-competitive effects may include an actual increase in the price of the good or service, a decrease in output, or a decline in quality." *Insignia Sys., Inc. v. News Am. Marketing In-Store, Inc.*, 2006 WL 1851137, at *5 (D. Minn. June 30, 2006). Harm to competition, not harm to competitors, constitutes an antitrust violation. *Double D Spotting Serv. v. Supervalu, Inc.*, 136 F.3d 554, 561 (8th Cir. 1998); *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

The Court finds that AHRN has alleged that RMLS's business model has anticompetitive effects. Specifically, AHRN alleges that RMLS and its co-conspirators promote "dual-agency home sales," wherein a seller and buyer's agent are associated with the same agency. According to AHRN, because commissions are based on the sale price of the home, a broker and agent relying on dual agency have little incentive to negotiate in the interests of either the buyer or the seller, and both the buyer and the seller lose any right to independent advice and representation from the agent and broker.[27] AHRN also alleges that the behavior of RMLS and its co-conspirators serves to increase the price of referral fees by excluding actors like AHRN from the market.

RMLS responds that AHRN's allegations regarding dual-agency home sales are "nonsensical" because the purpose of MLSs is to allow agents to cross company lines to sell one another's homes. *See Mid-Am. Real Estate Co. v. Iowa Realty Co.*, No. 4:04-CV-10175, 2004 WL 1280895, at *2 (S.D. Iowa May 28, 2004), *rev'd in part on other*

_____

[27] AHRN alleges that dual-side agency home sales are promoted in two main ways. First, when potential customers find a property on a listing broker's website, that broker can direct the customers to its own listing agent and divert them away from an independent agent. Second, RMLS sets restrictions on when third parties can access its data feeds, and will not allow access to third parties who send customers to real estate agents not affiliated with the listing broker.

*grounds*, 406 F.3d 969 (8th Cir. 2005) (explaining that MLSs exist "so agents can cross company lines to sell one another's homes and can show clients all houses on the market, not just those homes listed with their own company").  RMLS further points out that there will remain other real estate listing websites that compete in the marketplace regardless of whether AHRN survives.  The Court finds, however, that AHRN has plausibly alleged that RMLS and its co-conspirators have attempted to restrict access to real estate listings to parties who will send potential home buyers to listing agents' companies, thereby eliminating competition from those that do not comply with RMLS's business model.

RMLS also argues that AHRN cannot state anticompetitive effects because agents' commissions and homes' initial listing prices are set prior to homes being listed on NorthstarMLS.  However, AHRN has alleged that the dual-agency process results in less negotiation on behalf of customers after these initial prices are set.  Thus, AHRN has plausibly alleged that the conspiracy has an effect on home prices and commissions.

RMLS further claims that AHRN cannot recover for economic loss from not having the ability to infringe on MLSs' copyrights because this loss is not the type that the Sherman Act is designed to prevent.  *See, e.g.*, *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir. 1972) ("[P]laintiff's good faith effort to enf[o]rce its copyright . . . is not the kind of exclusionary conduct condemned by . . . the Sherman Act.").  However, as noted above, AHRN claims that RMLS does not, in fact, own copyrights that it asserts so the Court will not dismiss the claim on this basis.

RMLS also argues that AHRN has not alleged that its activities produced significant anticompetitive effects because it has not plausibly alleged market foreclosure.  Specifically, RMLS claims that AHRN is able to access "for sale by owner" and foreclosure listings and has already shown that it has entered into licensing agreements with over 180 Minnesota licensed real estate brokers and approximately fifty Minnesota licensed real estate agents.  The Court finds, however, that AHRN has plausibly alleged that there are no reasonable alternative sources of **complete** real estate data than from MLSs and that RMLS's refusal to license its data therefore had an effect on the ability of businesses like AHRN to compete.  Accordingly, the Court finds that AHRN has sufficiently alleged harm and anticompetitive effects, and it will deny the motion to dismiss AHRN's Sherman Act counterclaim.

### B.      Minnesota and California Antitrust Laws

RMLS also moves to dismiss AHRN's claim of violations of the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, and the California Cartwright Act, Cal. Bus. & Prof. Code § 16720.  These statutes are modeled after the Sherman Act.  *See State v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 894 (Minn. Ct. App. 1992); *Vannelli v. NCAA*, No. C3-87-2039, 1988 WL 35433, at *3 (Minn. Ct. App. Apr. 19, 1988); *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 852 (Cal. 1971).  RMLS argues that these claims should be dismissed for the same reasons as the Sherman Act claim.  Because this Court will not dismiss the Sherman Act claim, it will not dismiss these claims.

### C.    Minnesota Deceptive Trade Practices Act

RMLS finally moves to dismiss AHRN's claim of violations of the MDPTA.  The MDPTA permits an injured party to enjoin the disparagement of its "goods, services or business by false or misleading statements of fact."  Minn. Stat. § 325D.44, subd. 1(8).  A plaintiff seeking injunctive relief under the MDTPA must show a likelihood of confusion among consumers that has resulted from the defendant's violation of the MDTPA.  *See LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1489-90 (D. Minn. 1996); Minn. Stat. § 325D.44, subd. 2.

AHRN alleges that, by advising its member-brokers that information obtained and used by AHRN on its NeighborCity website is subject to valid copyright protection, and that AHRN's use of such information is unlawful, RMLS has disparaged the services and business of AHRN with false and misleading statements.

RMLS argues, first, that AHRN failed to plead the contents of RMLS's disparaging statements with particularity as required by Fed. R. Civ. P. 9(b).  The Court finds otherwise because AHRN has alleged that RMLS falsely asserted that AHRN was unlawfully using information copyrighted by RMLS.

RMLS next argues that, even if the allegedly disparaging statements were false, AHRN cannot show that the statements had a disparaging effect when taken in context.  *See Aviation Charter, Inc. v. Aviation Research Grp./US*, 416 F.3d 864, 872 (8th Cir. 2005).  Specifically, RMLS claims that the statements at issue are not disparaging because they are alleged to be solely between RMLS and its member-brokers regarding AHRN, and AHRN has failed to allege any disparaging effect that resulted from such

internal communications.  The Court finds, however, that AHRN has adequately alleged that its services and business have been disparaged as a result of RMLS's statements.  Whether these statements in fact had a disparaging effect or caused a likelihood of confusion is an issue for a later stage in the litigation.  Accordingly, the Court will deny the motion to dismiss AHRN's MDTPA claim.


## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

**1.**     Plaintiff's Motion for Contempt for Violations of Preliminary Injunction [Docket No. 47] is **GRANTED in part** and **DENIED in part:**

    a.     Defendant is held in civil contempt.

    b.     Plaintiff's motion for Defendant to pay Plaintiff's costs and fees incurred in bringing this motion is **GRANTED**, in an amount to be determined by the Court.  Plaintiff is ordered to submit its reasonable costs and fees incurred in bringing this motion to the Court within fourteen (14) days.

    c.     Plaintiff's motion for a civil fine against Defendant is **DENIED.**

    d.     Plaintiff's motion to hold Jonathan Cardella in civil contempt is **DENIED.**


**2.**     Plaintiff's Motion to Dismiss [Docket No. 78] is **DENIED.**

**3**.      The Court **AMENDS** the September 27, 2012, preliminary injunction order [Docket No. 35] by **STRIKING** paragraph 2 in the ordering section and **REPLACING** it with the following language:

2.      Plaintiff's Motion for Preliminary Injunction [Docket No. 14] is **GRANTED in part** and **DENIED in part** as follows:

(a)      Defendant, along with any of its officers, directors, subsidiaries, and successors, and all persons and entities acting in concert therewith, are immediately and until further order of this Court **PRELIMINARILY ENJOINED** from engaging in any unauthorized copying, display, use, and/or public distribution of:

(1) the works covered by U.S. Copyright Reg. Nos. TX VA 1-432-912; VA 1-432-913; VA 1-432-914; and VA 1-432-917, and

(2) the photographs from the listings of Twin Oaks and Countryside attached to the November 15, 2012, Declaration of Michael Bisping;

(b)      As of August 19, 2013, Defendant, along with any of its officers, directors, subsidiaries, and successors, and all persons and entities acting in concert therewith, are **PRELIMINARILY ENJOINED** from engaging in any unauthorized copying, display, use, and/or public distribution of Plaintiff's other copyrighted photographic works;

(c)      On or before August 5, 2013, Plaintiff is **ORDERED** to place watermarks on each photograph on NorthstarMLS to which it owns a copyright and to remove watermarks from any photographs on NorthstarMLS to which it does not own a copyright.

(d)     Defendant, along with any of its officers, directors, subsidiaries, and successors, and all persons and entities acting in concert therewith, are immediately and until further order of this Court **PRELIMINARILY ENJOINED** from engaging in any unauthorized copying, display, use, and/or public distribution of the Plaintiff's copyrighted "agent remarks" and "public remarks."

**4**.     On or before August 5, 2013, Defendant shall submit to this Court an affidavit from an officer of Defendant confirming that Defendant is complying with the terms of this Order and that any copyrighted works belonging to RMLS subject to this injunction have been removed and deleted from www.neighborcity.com and from any servers or other storage devices under AHRN's control.  Such offer shall also describe in detail the procedures that AHRN has established to prevent the unlawful copying, display, use, and/or public distribution of Plaintiff's copyrighted works until further order of this Court.

DATED:  July 5, 2013                                  ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                                   JOHN R. TUNHEIM
                                                      United States District Judge