## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| REGIONAL MULTIPLE LISTING SERVICE OF MINNESOTA, INC., *d/b/a NorthstarMLS*, | Civil No. 12-965 (JRT/FLN) |
| Plaintiff/Counterclaim Defendant, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS** |
| AMERICAN HOME REALTY NETWORK, INC., | |
| Defendant/Counterclaim Plaintiff, | |
| v. | |
| EDINA REALTY, INC. and HOMESERVICES OF AMERICA, INC., | |
| Counterclaim Defendants. | |

Chad A. Snyder, Adam P. F. Gislason, Matthew D. Schwandt, and Michael H. Frasier, **SNYDER GISLASON FRASIER LLC**, 233 Park Avenue South, Suite 205, Minneapolis, MN  55415; Christopher R. Miller, **AMERICAN HOME REALTY NETWORK INC.**, 222 Seventh Street, Second Floor, San Francisco, CA  94103; Daniel E. Gustafson, Karla M. Gluek, and Amanda M. Williams, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN  55402; and L. Peter Farkas, **FARKAS + TOIKKA LLP**, 1011 Thirtieth Street N.W., Washington, D.C.  20007, for defendant/counterclaim plaintiff.

Mark R. Bradford, Jeffrey R. Mulder, and Stanford P. Hill, **BASSFORD REMELE, PA**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for counterclaim defendants Edina Realty, Inc. and HomeServices of America, Inc.

Plaintiff Regional Multiple Listing Service of Minnesota, Inc. ("RMLS") initiated

this copyright infringement action against defendant American Home Realty Network,

Inc. ("AHRN"), alleging that AHRN uses photographs and other copyrighted materials from RMLS's real estate listing service without permission.  AHRN, in turn, brought counterclaims against RMLS, alleging that it violated federal and state antitrust and trade practices laws by conspiring to exclude AHRN from its network.  RMLS moved to dismiss AHRN's counterclaims, but the Court denied its motion.  AHRN later added Edina Realty, Inc., ("Edina Realty") a member of RMLS, and its parent company HomeServices of America, Inc. ("HomeServices") as third-party counterclaim defendants (collectively "Counterclaim Defendants") to the antitrust claims.  The Counterclaim Defendants now similarly move to dismiss the claims asserted against them.  The Court will also deny this motion, finding that AHRN's allegations adequately state claims of antitrust violations against Edina Realty and HomeServices.

## BACKGROUND[1]

### I.    PARTIES

RMLS is a real estate listing service company through which more than 13,000 real estate brokers and agents in Minnesota and western Wisconsin pool and disseminate information on homes available for sale in their regions.  (Compl. ¶ 8, Apr. 18, 2012, Docket No. 1; Second Am. Countercl. ¶ 20, Apr. 4, 2013, Docket No. 95.)  RMLS is a cooperative run by local member-brokers and is affiliated with the National Association

---

[1] The Court's previous orders provide a full discussion of the facts related to this case. *See, e.g., Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, Civ. No. 12-965, 2013 WL 3367132 (D. Minn. July 5, 2013); *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, Civ. No. 12-965, 2012 WL 4470286 (D. Minn. Sept. 27, 2012).  The Court will recite here only those facts relevant to this motion.

of Realtors ("NAR").   (Second Am. Countercl. ¶ 20.)   It is governed by a Board of Governors comprised of members appointed by the member-brokers.  (*Id.* ¶ 16.)

RMLS operates NorthstarMLS to provide real estate brokers and agents with real estate listing information by sending to member-brokers' consumer-facing website a data feed that includes the broker's own listings and the listings of all other NorthstarMLS members.  (Second Am. Countercl. ¶¶ 16, 20; Compl. ¶ 9.)  Agents and brokers also use NorthstarMLS for access to real estate listings and information in their respective markets.  (Compl. ¶ 9.)  Further, RMLS makes available brokers' offers of cooperation, which are the commission splits that listing brokers will pay other brokers who represent a buyer.  (Second Am. Countercl. ¶ 20.)

According to AHRN's allegations, Edina Realty is the largest real estate company in Minnesota and the largest member of RMLS.   (*Id.* ¶ 2.)   It is a subsidiary of HomeServices.  (*Id.*)  Edina Realty has three members on the RMLS Board of Governors, one of whom is the board's chairman.  (*Id.* ¶ 17.)  AHRN alleges that HomeServices is the parent company of Edina Realty and the second-largest real estate brokerage firm in the United States, owning subsidiary firms in California, Indiana, Iowa, Kentucky, Minnesota, Missouri, North Carolina, and Pennsylvania.  (*Id.* ¶ 3.)

Defendant and counterclaim plaintiff AHRN owns NeighborCity, another online residential real estate service.  (*Id.* ¶ 5.)  NeighborCity offers three primary services to its visitors:  information about properties for sale, connection with buyer-side real estate agents for prospective buyers, and, through its AgentMatch software system, performance metrics, rankings, and statistics regarding real estate agents.  (*Id.* ¶¶ 5-14.)

## II.    COUNTERCLAIMS

After RMLS brought its initial complaint against AHRN for copyright violations,[2] AHRN brought counterclaims against RMLS, alleging violations of the Sherman Act, 15 U.S.C. §§ 1 *et seq.* (Count I); Minnesota antitrust statutes, Minn. Stat. §§ 325D.49 to 325D.66 (Count II); the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16726 (Count III); and the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44 (Count IV).  (Second. Am. Countercl. ¶¶ 61–78.)

RMLS moved to dismiss the counterclaims against it, but the Court denied the motion.  *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.* ("*RMLS I*"), Civ. No. 12-965, 2013 WL 3367132 (D. Minn. July 5, 2013), *modified on other grounds by* 2013 WL 6481201 (D. Minn. Dec. 10, 2013), 2014 WL 67952 (D. Minn. Jan. 8, 2014).  AHRN subsequently amended its counterclaims to add Edina Realty and HomeServices as Counterclaim Defendants.  (Second Am. Countercl. at 1, 7.)  Edina Realty and HomeServices now move to dismiss the counterclaims against them.

## III.    COUNTERCLAIM AGAINST RMLS

The Counterclaim Defendants contend that AHRN's claims against them are fundamentally different than the original claims against RMLS, and, accordingly, that the

---

[2] RMLS alleges that AHRN willfully infringed RMLS's copyrighted material by displaying the material on NeighborCity.  On September 27, 2012, the Court entered a preliminary injunction against AHRN.  *Reg'l Multiple Listing Serv. of Minn. v. Am. Home Realty Network, Inc.*, Civ. No. 12-965, 2012 WL 4470286, at *11 (D. Minn. Sept. 27, 2012), *amended by* 2013 WL 3367132 (D. Minn. July 5, 2013), *modified by* 2013 WL 6481201 (D. Minn. Dec. 10, 2013), 2014 WL 67952 (D. Minn. Jan. 8, 2014).  The proceedings regarding RMLS's direct claims against AHRN are not relevant to the counterclaim issues addressed in this Order.

claims should be dismissed even though the Court already denied the motion to dismiss the same claims against RMLS.  The Court will outline below some of the primary allegations relevant to the counterclaims against RMLS and the Court's previous conclusions regarding the adequacy of those allegations.

### A.    Agreement Not to License Information to AHRN

AHRN alleged that RMLS and its participant brokers entered into a continuing agreement to suppress competition in the marketplace.  (First Am. Countercl. ¶ 26, Dec. 21, 2012, Docket No. 73.)  First, AHRN alleged that RMLS and its brokers collectively agreed to refuse to give AHRN a license to access data feeds containing real estate listing data.  (*Id.*)  According to AHRN, RMLS and its members allow non-member third parties to access its database information, but they have endorsed and participated in a decision to enforce restrictions on which non-member third parties can access the information.  (*Id.* ¶¶ 27-28.)  AHRN alleged that they base their decision on the third party's business model.  (*Id.* ¶ 28.)  Among those restrictions is a requirement that third parties not allow access to any third party that provides buyer-side referrals (i.e., real estate agents not affiliated with the listing broker).  (*Id.* ¶¶ 27-28.)  In other words, RMLS and its members will not allow access to third parties like AHRN, because AHRN makes referrals to the agent it determines is best suited for the buyer regardless of the agent's affiliation with the listing broker.  (*Id.*)  AHRN alleged that it contacted all of the third-parties that receive MLS  data feeds to seek access to the data prior to this suit, and those third parties refused to extend the license on account of this alleged restriction on third-parties.  (*Id.* ¶ 31.)  Further, AHRN alleged that no reasonable alternative sources

of complete real estate data are available that would enable AHRN to conduct its business. (*Id.* ¶ 23.)

AHRN asserted that this restriction on which third parties may receive data promotes an anticompetitive business model and destroys other innovative businesses in their attempt to enter the real estate market because RMLS and its participants control who has access to critical real estate data. (*Id.* ¶ 19.) AHRN alleged that consumers suffer when new business models are forced out of the market. (*Id.* ¶ 25. (quoting the U.S. Department of Justice as saying "'[n]ew business models are emerging that allow consumers to save thousands of dollars when they buy or sell a home,' but 'competition also suffers when brokers exclude low-cost rivals from the multiple listing service (MLS), which limits price competition'").)

### B.    Agreement to Assert Sham Copyrights

Second, AHRN alleged that RMLS and its participant members agreed to assert sham copyright claims to the NorthstarMLS listing data in order to suppress competition by intimidating businesses, like AHRN, that seek to compete with their current business model. (*Id.* ¶ 26.) AHRN alleged that RMLS asserts copyrights over information that "is not copyrightable, not properly registered in compliance with the Copyright Act, or not owned by [RMLS]." (*Id.* ¶ 42.)

In support of its conspiracy theory regarding the sham copyrights, AHRN referred to the NAR annual meeting on November 11 to 14, 2011, where member listing services – including RMLS – allegedly discussed the threat AHRN posed to the industry and their intent to shut down AHRN. (*Id.* ¶ 33.) According to AHRN, "[f]ollowing the annual

NAR meeting, . . . [it] received more than 30 similar cease and desist letters from MLSs and brokers across the country." (*Id.* ¶ 34.)  In each letter, the sender claimed that AHRN was improperly using information over which the sender held a copyright.  (*Id.*)  AHRN claimed that it disputed the copyright assertions but responded to each of the MLS letters with an offer to purchase a license to the allegedly copyrighted material.  (*Id.* ¶ 35.) AHRN alleges that all of the MLSs and brokers refused to discuss a licensing agreement, in furtherance of their group boycott against AHRN.  (*Id.* ¶ 36.)  AHRN further alleges a conspiracy based on a meeting of the NAR Board of Directors that took place on May 19, 2012.  (*Id.* ¶¶ 38-39.)  At that meeting, the Board voted to institute new rules to further exclude competitors like AHRN from receiving MLS data and to fund the instant action and a substantially similar action against AHRN in United States District Court for the District of Maryland.  (*Id.* ¶ 39 (identifying specific statements in the meeting minutes as support for its conspiracy allegations).)

### C.   *RMLS I*

The Court in *RMLS I* found that these allegations sufficed to state a claim against RMLS for violation of § 1 of the Sherman Act.   After concluding that the *Noerr-Pennington* doctrine did not immunize RMLS because AHRN adequately pleaded that the sham exception applied, the Court found that AHRN adequately pleaded a plausible conspiracy, both between RMLS and other listing services across the country and the NAR, and between RMLS and its member-brokers.  *RMLS I*, 2013 WL 3367132 at *11-*15.  With regard to a conspiracy between RMLS and its member-brokers, the Court found:

> The gravamen of AHRN's counterclaim is that RMLS and its member-brokers colluded to use RMLS as a vehicle to assert false copyright claims that impeded AHRN's business model and to exclude companies like AHRN from accessing the universe of listings needed to compete. Furthermore, AHRN has alleged that RMLS and its member-brokers dissuaded brokers and agents within RMLS's service area from entering referral agreements with AHRN. Through these allegations, AHRN has sufficiently alleged that RMLS and its coconspirators engaged in concerted action under the Sherman Act.

*Id.* at *15 (internal citation omitted).  The Court further found that AHRN adequately alleged an unreasonable restraint of trade under either a per se rule of illegality or a rule of reason analysis.  *Id.* at *16.  Under a per se analysis, the Court found that AHRN's allegations plausibly amounted to a group boycott because

> RMLS and its coconspirators cut off access to the supply necessary to enable the boycotted firm to compete.  Specifically, AHRN alleges that RMLS and its co-conspirators have cut off access to information that is critical to any business attempting to compete with them.  These allegations satisfy the element of cutting off a supply necessary for AHRN and similar businesses to compete.

*Id.* at *17 (internal quotations, citation, and alteration omitted).  The Court also found that AHRN had alleged that RMLS and its coconspirators possessed a dominant position in the relevant market and that the challenged practices were not justified by plausible arguments that they were intended to benefit the market by making it more efficient and competitive.  *Id.*  In the alternative, the Court found under a rule of reason analysis that RMLS's business model had anticompetitive effects because its protection of member-brokers' ability to keep commissions from both sides of the transaction increases the price of buying a home to consumers by excluding competitors such as AHRN.  *Id.* at *18.

**IV.     NEW ALLEGATIONS AGAINST COUNTERCLAIM DEFENDANTS**

After oral argument on the counterclaims against RMLS but before the Court's decision in *RMLS I*, AHRN amended its counterclaims to add Edina Realty and HomeServices as Counterclaim Defendants on the Sherman Act and state antitrust claims (but not Count IV for violation Minnesota Deceptive Trade Practices Act).  (Second Am. Countercl. at 27-33.)   The Second Amended Counterclaim adds Edina Realty and HomeServices to many of the allegations against RMLS and adds several specific allegations against Edina Realty and HomeServices.   AHRN added Edina Realty and HomeServices to its allegations that RMLS and participant brokers entered into a continuing agreement to suppress competition in the marketplace (*id.* ¶ 29), allow non-member third parties access to the data feed information but restrict which third parties can access the information, including AHRN (*id.* ¶¶ 30-31), agreed to assert sham copyright claims to the listing data against AHRN (*id.* ¶ 37), and collectively refused to discuss any licensing of the listing data with AHRN (*id.* ¶ 38).

In addition to adding Edina Realty and HomeServices to its allegations against RMLS generally, AHRN added new allegations about specific actions taken by both Edina Realty and HomeServices.   AHRN alleges that HomeServices sent a letter on behalf of Edina Realty and its other subsidiaries on January 5, 2012 demanding that AHRN cease all "infringement of copyrights."  (*Id.* ¶ 59.)  According to AHRN, the letter did not describe what copyrighted material had been wrongfully used by AHRN, and AHRN received no response when it asked HomeServices to identify such material.  (*Id.*)  Accordingly, AHRN assumed that the letter was a "threat of litigation, [] sent to

intimidate AHRN into ceasing its competition with Edina Realty and other brokers." (*Id.*)

AHRN also points to a letter sent by Edina Realty on June 11, 2012, stating that it was rescinding any agreements that its agents or brokers had entered into with AHRN, and that Edina Realty had no interest in entering any future agreements with AHRN.  (*Id.* ¶ 39.)   AHRN alleges that HomeServices' January 5, 2012 letter also retracted any agreement between AHRN and any agents of the brokerage companies it owns.  (*Id.*)

Counterclaim Defendants now move to dismiss all claims against them under Federal Rule of Civil Procedure 12(b)(6).  The Court will deny the motion to dismiss because, in light of the Court's prior analysis of very similar claims against RMLS, the Court finds that AHRN's allegations against Edina Realty and HomeServices adequately state a claim under § 1 of the Sherman Act.

## ANALYSIS

## I.  STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "'claim to relief that is plausible on its face.'" *See, e.g.*, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility" and

therefore must be dismissed.  *Id.* (internal quotation marks omitted).  Although the Court accepts the complaint's factual allegations as true, it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Therefore, to survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## II.    SHERMAN ACT

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  To establish a claim under Section 1 of the Sherman Act "a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce."  *Insignia Sys., Inc. v. News Am. Mktg. In–Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009).  Because Section 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984), "'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express,'" *Twombly*, 550 U.S. at 553 (alterations in original)

(quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).

In *RMLS I*, the Court concluded that "[t]he gravamen of AHRN's counterclaim is that RMLS and its member-brokers colluded to use RMLS as a vehicle to assert false copyright claims that impeded AHRN's business model and to exclude companies like AHRN from accessing the universe of listings needed to compete." *RMLS I*, 2013 WL 3367132 at *15. Thus, the Court has already determined that AHRN adequately alleged that RMLS and its member-brokers colluded to eliminate AHRN's access to the real estate listing information compiled and shared by these brokers. Because Edina Realty is a member-broker of RMLS there can be no dispute at this stage of the case that the allegations in AHRN's counterclaim are sufficient to allow the Court to draw the reasonable inference that Edina Realty engaged in a conspiracy that could satisfy the first element of a Sherman Act claim.[3] *See Morris v. Am. Nat'l Can Corp.*, 988 F.2d 50, 52 (8th Cir. 1993) (explaining law of the case doctrine, that "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case'" (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983))).

Rather, the newly-added Counterclaim Defendants challenge the adequacy of AHRN's pleadings on two other grounds: first, that the allegation that HomeServices sent a cease and desist letter (on Edina Realty's behalf) does not alone adequately plead restraint of trade, and second, that the group boycott allegation must fail because AHRN

---

[3] As the Court will explain below, the allegations against Edina Realty also suffice to state a claim against its parent company, HomeServices, because AHRN alleges that HomeServices took direct action to participate in the anti-competitive conspiracy by sending a letter to AHRN on Edina Realty's behalf. *See infra* Part II.C.

has never sought licensing from Edina Realty, AHRN fails to allege that Edina Realty and HomeServices have sufficient market power, and it is not a violation of the Sherman Act for a competitor to refuse to gratuitously share with a competitor.  None of these arguments suffice to dispose of AHRN's claims at this preliminary stage.

## A.    Cease and Desist Letters

In its July 5, 2013 order, the Court found that AHRN had sufficiently alleged that RMLS engaged in a conspiracy with its member-brokers to assert false copyright claims that "impeded AHRN's business model" and excluded "AHRN from accessing the universe of listings needed to compete."  *RMLS I*, 2013 WL 3367132 at *15.  Edina Realty and HomeServices argue that this conclusion should not extend to them, however, because they have not asserted any copyright infringement claims against AHRN.  (Mem. in Supp. of Mot. to Dismiss at 4, July 29, 2013, Docket No. 148.)  They acknowledge that HomeServices (on behalf of Edina Realty) sent a cease and desist letter to AHRN, but claim that sending such a letter to a third party does not restrain trade or otherwise create antitrust liability.  (*Id.* at 5.)

As the Court previously found with regard to RMLS, allegations of the assertion of sham copyrights suffice to plead a restraint on trade because without license to publish photos and descriptions from RMLS's listing data (including those for which Edina Realty allegedly holds the copyright), AHRN cannot operate its business in the areas served by Edina Realty and RMLS.  (Second Am. Countercl. ¶ 26 ("[T]here are no reasonable alternative sources of complete real estate data for the relevant areas other than from the MLS or directly from the brokers . . . .");  *see also Robertson v. Sea Pines*

*Real Estate Cos.*, 679 F.3d 278, 282 (4th Cir. 2012) ("Particularly in an area served by only one MLS, access to MLS resources may be critical for a brokerage to successfully participate in the relevant real estate market.").) That Counterclaim Defendants sent a cease and desist letter, but did not institute a copyright infringement action like RMLS, does not preclude the Court's analysis with regard to RMLS from similarly applying to Counterclaim Defendants.

First, the fact that Counterclaim Defendants' assertion of copyright ownership against AHRN came in the form of a cease and desist letter rather than a lawsuit for copyright violation is immaterial here, as cease and desist letters typically initiate or give notice that copyright litigation may follow if the sender's demands are not met. *Cf. Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1376-77 (Fed. Cir. 2004) ("pre-litigation communications alleging patent infringement" are treated as actual litigation for *Noerr-Pennington* purposes); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985) ("[T]he threat of unfounded trade secrets litigation in bad faith is sufficient to constitute a cause of action under the antitrust laws, provided that the other essential elements of a violation are proven.").

Second, Counterclaim Defendants argue that a single cease and desist letter cannot amount to an unreasonable restraint of trade. But AHRN has sufficiently alleged that the cease and desist letter was part of a larger conspiracy intended to preclude AHRN from doing business in the real estate brokerage industry in the area covered by RMLS. AHRN alleges that it "received more than 30 similar cease and desist letters from MLSs and brokers across the country – including from RMLS, Edina Realty, and its parent,

HomeServices," and that "[e]ach letter claimed that AHRN was improperly using information."   (Second Am. Countercl. ¶ 37; *see also id.* ¶ 59 (alleging that HomeServices, writing on behalf of Edina Realty and other subsidiaries, sent the January 5, 2012 letter demanding that AHRN cease its alleged "infringement of copyrights" and that "[t]he letter, with its threat of litigation, was sent to intimidate AHRN into ceasing its competition with Edina Realty and other brokers").)   AHRN alleges that these cease and desist letters form part of one of the two ways the anti-competitive scheme is effectuated, and were "for the purpose of preventing competitors from making lawful use of the information and thus suppressing competition in the market for real estate brokerage referrals and the market for real estate agent services." (*Id.* ¶ 62.)

The allegations here are comparable to those the Fourth Circuit found to sufficiently allege Sherman Act § 1 liability in *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278 (4th Cir. 2012).   There, putative class plaintiffs brought § 1 claims against real estate brokerages who were members of and served on the board of a regional listing service ("MLS"), alleging that the brokerages conspired, via the MLS, to pass bylaws and rules that were designed to "exclude innovative, lower-priced competitors and thus insulate the defendants from competitive pressures posed by brokerages that offered a larger menu of service choices and alternative pricing to their customers."   *Id.* at 283.   In concluding that the brokerages, although acting via representatives on the board of the MLS, could be considered separate actors for the purposes of § 1 liability, the court concluded that the members' efforts to exclude

innovative competitors via MLS rules fell within the scope of § 1.  *Id.* at 286.  The court

observed that

> the power of MLS board members to pass restrictive membership rules can
> also threaten economic harm to nonmembers and deprive the real estate
> market of the competitive forces that are at the heart of our national
> economic policy.  Where MLS members have the power to exclude other
> competitors from access to its pooled resources, there exists the potential
> for significant competitive harms alongside the competitive advantages of
> an MLS.  Section one is therefore an appropriate mechanism to ensure that
> the concerted action of MLS members retains a procompetitive character.

*Id.* (internal citations and quotations omitted).  The attempts to restrict access to listing

data here, either by cease and desist letters or by full-on copyright lawsuits, are

comparable to the rules and bylaws in *Sea Pines Real Estate* – they serve to exclude new

and innovative competitors from accessing the pooled resources of the listing service.

This is distinct from the claims in *Schachar v. American Academy of

Ophthalmology, Inc.*, which addressed not a tangible limitation on ophthalmologists'

possible business activities, but rather a position taken by a group of ophthalmologists.

870 F.2d 397, 398 (7th Cir. 1989).  As the court observed, the defendant there "did not

require its members to desist from performing the operation or associating with those

who do," and thus the fact that no plaintiffs contended that the defendant prevented him

from "doing what he wished or imposed sanctions on those who facilitated the work,"

required granting summary judgment for the defendant.  *Id.* at 398-99.  In contrast, the

allegations here, if true, would support a claim that Counterclaim Defendants and other

brokers who were a part of RMLS **in fact** precluded AHRN from operating its business

by limiting its access to information necessary to its operation without legal basis.  This is

precisely what the court in *Schachar* contemplated **would** amount to an antitrust

violation: when "one group of suppliers diminishes another's ability to peddle its wares." *Schachar*, 870 F.2d at 399. The Court therefore concludes that AHRN's allegations that Counterclaim Defendants participated in a scheme to limit AHRN's access to real estate listing data by sending a cease and desist letter sufficiently state a claim for a conspiracy in restraint of trade in violation of § 1 of the Sherman Act.

### B.   Group Boycott

The Counterclaim Defendants also challenge the sufficiency of AHRN's allegations that their activity amounts to an illegal group boycott. The Court in *RMLS I* found that RMLS's conspiratorial activities amounted to an unreasonable restraint of trade either under the per se rule as a group boycott or under rule of reason analysis. *RMLS I*, 2013 WL 3367132 at *16-*19.[4] With regard to group boycott, the Court concluded that AHRN sufficiently alleged that RMLS and its coconspirators (which included member-brokers such as Edina Realty) "cut off access to information that is critical to any business attempting to compete with them," and dominated the "market and information regarding home listings," and furthermore that their activities were not intended to enhance overall efficiency or make the market more competitive, but rather to preserve the extant business model of referring customers to listing brokers. *Id.* at *17.

---

[4] Because the Court concluded that rule of reason analysis supported the unreasonable restraint of trade element in the alternative to group boycott as a per se restraint, *see RMLS I*, 2013 WL 3367132 at *17, the Court would not be required to dismiss AHRN's claims against the Counterclaim Defendants even if the group boycott theory were to fail. The Court will not rely on this alternative ground, however, because it finds that AHRN has adequately stated a Sherman Act § 1 claim based on group boycott against the Counterclaim Defendants such that it should be permitted to advance the theory at later stages of litigation.

The Counterclaim Defendants make three arguments in support of their claim that, despite this finding, AHRN's pleadings against Edina Realty and HomeServices do not sufficiently allege that they participated in a group boycott.  None of these arguments preclude the Court's group boycott analysis in *RMLS I* from applying to the Counterclaim Defendants.[5]  First, they argue that AHRN never sought **licensing** of listing data from Edina Realty, but rather only referral agreements from Edina Realty's independent contractors.  This is a distinction without a difference – the referral agreements (which AHRN alleges Edina Realty refused to enter into and later repudiated any that existed, (*see* Second Am. Countercl. ¶ 39)), like the licenses, would have afforded AHRN access to real estate listing information.  The Court's previous group boycott analysis encompasses "information that is critical to any business attempting to compete with [RMLS and its member-brokers]," which is the property listing information, regardless of whether AHRN sought to access it by licensing agreements with RMLS or by referral agreements with member-brokers and their independent contractors.  Furthermore, although Counterclaim Defendants argue that AHRN has never asked Edina Realty to license data, AHRN alleges that "Edina Realty and its parent, HomeServices, refused to even discuss a licensing agreement."  (Second Am. Countercl. ¶ 39.)  Although Counterclaim Defendants may dispute this allegation as a matter of fact, taking this allegation as true the Court will not conclude that the distinction between licensing

---

[5] The group boycott issue centers on Edina Realty rather than HomeServices or their collective action, but, as the Court will explain in Part III.C, AHRN sufficiently states this claim against HomeServices as Edina Realty's parent company.

agreements and referral agreements defeats the sufficiency of AHRN's Sherman Act claims against Edina Realty and HomeServices.

Second, Counterclaim Defendants argue that AHRN has failed to allege group boycott because it has failed to allege that Edina Realty or HomeServices have sufficient market power such that they could have abused that market power to induce suppliers and customers to not do business with AHRN.  As the Court noted in *RMLS I*, AHRN alleges that "MLS's, including RMLS, have substantial market power," as "[t]hey control nearly all of the listing information for properties within their geographic service areas." (Second Am. Countercl. ¶ 65; *see also RMLS I*, 2013 WL 3367132 at *17.)  With respect to the Counterclaim Defendants, AHRN alleges that Edina Realty is the "largest real estate company in the state of Minnesota, and the largest member of RMLS," and that it has "three members on the RMLS Board of Governors, one of whom is its chairman, and is the largest member of RMLS," such that it and HomeServices "have significant influence over RMLS."  (*Id.* ¶¶ 2, 17.)  These allegations permit the Court to plausibly infer that Edina Realty and HomeServices maintain substantial power in the relevant market, both independently as the largest real estate company in Minnesota and through their influence over RMLS as the largest member of RMLS and a significant presence on its board.  Furthermore, specifically with regard to the restrictions that form the basis of the group boycott allegations, AHRN alleges that "Edina Realty, as RMLS's largest member, and acting under the direction of HomeServices, has endorsed and participated in the decision to enforce [the] restrictions."  (*Id.* ¶ 31.)

Counterclaim Defendants' reliance on *TheMLSonline.com, Inc. v. Regional Multiple Listing Service of Minnesota, Inc.*, 840 F. Supp. 2d 1174 (D. Minn. 2012), does not alter this analysis.  There, the court found that the plaintiff failed to state a claim for a Sherman Act violation on the basis that the defendants (including RMLS and Edina Realty) repeatedly pursued ethics violations against the plaintiff on account of the plaintiff's supposedly unauthorized use of "MLS" in its title and website.    840 F. Supp. 2d at 1181-82.  The court found no allegations sufficient to support a claim for group boycott because the plaintiff alleged no facts regarding defendants' market power nor "any attempts by Defendants to influence the behavior of customers or suppliers."  *Id.* at 1181.  Other than the common defendants, that case bears little resemblance to the facts here – as the court concluded, ethics complaints or the threat of ethics complaints did not hinder the plaintiff's ability to participate in real estate business in the state – the plaintiff remained a member of the Minnesota realtor association and maintained access to the RMLS listings.  *Id.* at 1182.  Here, AHRN has alleged that RMLS and the Counterclaim Defendants hold significant market power and that the alleged collective action was designed to prevent AHRN from participating at all in the real estate brokerage or listing business in this area.

Finally, Counterclaim Defendants argue that AHRN fails to "state a claim because competitors cannot be forced to cooperate with each other.  And it would turn antitrust law on its head to use it to compel one company to license its intellectual property to its competitors, even if the Court assumes that is what AHRN asked Edina Realty to do here."  (Mem. in Supp. of Mot. to Dismiss at 9.)  This argument misses the point,

however, as AHRN's claims do not seek antitrust liability for Edina Realty's refusal to provide access to its listing data via referral agreements alone, but rather for Edina Realty's participation in a conspiracy with other brokers and with RMLS to collectively restrict all access to the listing data, which is essential for AHRN to operate its business in the relevant market.  Here, where AHRN alleges that competitors – Edina Realty and other member-brokers – already **do** share information with each other, but refuse to share it with a business seeking entry into the market, the fact that Edina Realty may be a competitor of AHRN's does not alone relieve its potential § 1 liability.  *See Sea Pines Real Estate Cos.*, 679 F.3d at 286 ("Where MLS members have the power to exclude other competitors from access to its pooled resources, there exists the potential for significant competitive harms alongside the competitive advantages of an MLS." (internal quotations marks omitted)); *cf. Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196-202 (2010) (thirty-two NFL teams are competitors in one sense, as they "compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel," but can still be liable under § 1 for conspiring together).  The Court therefore concludes that, in accordance with its decision in *RMLS I*, AHRN has adequately stated a claim for Sherman Act § 1 liability based on a group boycott against Edina Realty (and, therefore, as the next section will address, also against HomeServices).

## C.    HomeServices

In addition to the substantive arguments about the adequacy of AHRN's § 1 Sherman Act claims, HomeServices argues that all claims against it must be dismissed

because "AHRN alleges no additional facts to take this case out of the general rule that a parent company is not liable for the acts of its subsidiaries." (Mem. in Supp. of Mot. to Dismiss at 10.) Courts have generally held that, in order for antitrust allegations against a subsidiary to be fairly made against the parent company, there must be allegations that the parent company actually engaged in anti-competitive conduct and not merely that it served as parent to its wholly-owned subsidiary. *See, e.g., H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1549 (8th Cir. 1989) (parent could not be held liable for claims against subsidiary, including Sherman Act claims, "without proof that **it** performed acts sufficient to create liability, or actively influenced [the subsidiary] in its violations" (emphasis in original)); *Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006) ("in the antitrust context, courts have held that absent allegations of anticompetitive conduct by the parent, there is no basis for holding a parent liable for the alleged antitrust violation of its subsidiary" and collecting cases). Courts have repeatedly found that, where a plaintiff alleges only that a parent wholly owns a subsidiary or generally alleges that the parent company participated in the conspiracy, without specific examples, plaintiff fails to state a claim against the parent for the subsidiary's actions. *See, e.g., Arnold Chevrolet LLC*, 418 F. Supp. 2d at 178; *RSM Prod. Corp. v. Petroleos de Venezuela Societa Anonima (PDVSA)*, 338 F. Supp. 2d 1208, 1216 (D. Colo. 2004). Here, however, AHRN alleges that HomeServices took specific action, separate and apart from Edina Realty's actions, that generally furthered the alleged anti-competitive conspiracy. AHRN alleges that HomeServices sent a letter on behalf of Edina Realty and other subsidiaries to AHRN's CEO on January 5, 2012, demanding that AHRN cease its

alleged "infringement of copyrights," in an attempt to "intimidate AHRN into ceasing its competition with Edina Realty and other brokers." (Second Am. Countercl. ¶ 59; *see also* Decl. of Chad A. Snyder, Ex. 1, Aug. 21, 2013, Docket No. 165.)[6] This allegation amounts to "direct and independent participation in the alleged conspiracy," and is sufficient to state a claim against HomeServices at this stage. *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688 (E.D. Pa. 2009).

### C.    Minnesota and California Antitrust Law Claims

The Counterclaim Defendants also move to dismiss AHRN's claim of violations of the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, and the California Cartwright Act, Cal. Bus. & Prof. Code § 16720. These statutes are modeled after the Sherman Act and are interpreted consistently with the Sherman Act. *See, e.g.*, *State v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 894 (Minn. Ct. App. 1992) ("Minnesota courts have consistently held that Minnesota antitrust law is to be interpreted consistently with the federal courts' construction of federal antitrust law." (citing *Keating v. Philip Morris, Inc.*, 417 N.W.2d 132, 136 (Minn. Ct. App. 1987); *State v. Duluth Bd. of Trade*, 121 N.W. 395, 399 (Minn. 1909))); *Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.*, 484 P.2d 953, 959 (Cal. 1971) (the Cartwright Act was "patterned after the Sherman Act . . . and decisions under the latter act are applicable to the former"). The Counterclaim

---

[6] The Court properly considers the letter itself at this stage because it is a document "necessarily embraced by the complaint," because its contents are alleged in the complaint and neither party questions its authenticity. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012). The Court does not, however, consider the additional email chain referenced by AHRN in its Memorandum in Opposition to the Motion to Dismiss, (*see* Mem. in Opp. to Mot. to Dismiss at 10-11, Aug. 21, 2013, Docket No. 164; Snyder Decl., Ex. 2) as neither the existence of those emails, nor their content, are alleged in the counterclaims.

Defendants' arguments as to why these claims should be dismissed are the same as those regarding the Sherman Act claim, so the Court will not dismiss these claims for the same reasons it will not dismiss the Sherman Act claim. *Cf. RMLS I*, 2013 WL 3367132 at *19.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Counterclaim Defendants Edina Realty and HomeService's Motion to Dismiss [Docket No. 146] is **DENIED**.

DATED: March 31, 2014
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
United States District Judge